Behram V. Parekh, State Bar #180361
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444
bparekh@wisnerbaum.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GARY PATANIA, ELLEN TAYLOR, KENNETH CROSS, DOROTHY TRACY, GEORGIA MARSHALL, and HOLLY JOHNSON,<br><br>*Plaintiffs*,<br><br>v.<br><br>ABBOTT LABORATORIES,<br><br>*Defendant*. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs GARY PATANIA, ELLEN TAYLOR, KENNETH CROSS, DOROTHY TRACY, GEORGIA MARSHALL, and HOLLY JOHNSON (collectively "Plaintiff" or "Plaintiffs") by and through undersigned counsel, and for their Complaint against Defendant ABBOTT LABORATORIES seeking damages (the "Action"), allege as follows:

## INTRODUCTION

1. This is a product liability action involving injuries sustained by Plaintiffs following the implantation and failure of a spinal cord stimulator (SCS) system designed, manufactured, and marketed by Defendant Abbott Laboratories ("Abbott"). The devices were implanted in Plaintiffs' bodies as a purported treatment for chronic pain, but they failed to perform as promised and instead caused serious harm.

2. The SCS device at issue received Food and Drug Administration ("FDA") approval in 2001 under PMA P010032, originally granted to Advanced Neuromodulation Systems, later acquired by St. Jude Medical. Since that time, however, the device has been fundamentally altered through hundreds of PMA supplements, modifying its battery chemistry, firmware, waveform control, leads, and user interface, without the benefit of a new PMA or any renewed clinical safety validation. As alleged in detail below, a number of these changes were significant enough that they met the regulatory criteria for a panel-track supplement supported by new clinical data, see 21 U.S.C. § 379i(4)(B); 21 C.F.R. § 814.39(a), yet Abbott processed them instead as lesser-tier supplements reserved for minor changes, thereby avoiding the clinical revalidation those changes required.

3. These cumulative changes, approved outside public view, transformed the device's mechanism of action, performance characteristics, and risk profile. Abbott failed to disclose these material changes to patients, physicians, or regulators. As a result, Plaintiffs were implanted with a device that was materially

different from what had been tested and originally approved by the FDA. Plaintiffs suffered painful neurologic symptoms, worsening pain symptoms, and potentially permanent injuries.

4. Plaintiffs bring this Action under California, Arkansas, Florida, Georgia, Illinois, and Texas law, asserting both traditional product liability and statutory claims. These claims are based in part on Abbott's failure to satisfy the requirements that federal law itself imposes on PMA and PMA-supplement holders, and/or on independently existing duties under applicable state common and statutory law; Plaintiffs do not seek to impose any requirement on Abbott that is different from, or in addition to, the requirements imposed by the FDCA and its implementing regulations. Plaintiffs seek compensatory damages for Plaintiffs' injuries.

## PARTIES

### I. PLAINTIFFS

5. **Plaintiff Gary Patania** is a resident and citizen of the State of California, and a resident of Butte County, California, a county in this District. At the time this Complaint is filed, Plaintiff Patania resides in California. The device at issue was implanted in Plaintiff Patania in California. Plaintiff Patania has received medical treatment related to the device in California. Plaintiff Patania had his Abbott SCS permanent device implanted on May 13, 2026.

6. **Plaintiff Ellen Taylor** is a resident and citizen of the State of Arkansas. At the time this Complaint is filed, Plaintiff Taylor resides in Ouachita County, Arkansas. The devices at issue were implanted in Plaintiff Taylor in Arkansas. Plaintiff Taylor has received medical treatment related to the devices in Arkansas. Plaintiff Taylor had her Abbott SCS permanent device implanted on June 11, 2021.

7. **Plaintiff Kenneth Cross** is a resident and citizen of the State of

Georgia. At the time this Complaint is filed, Plaintiff Cross resides in Butts County, Georgia. The device at issue was implanted in Plaintiff Cross in Georgia. Plaintiff Cross has received medical treatment related to the device in Georgia. Plaintiff Cross had his Abbott SCS permanent device implanted on July 22, 2019.

8. **Plaintiff Dorothy Tracy** is a resident and citizen of the State of Florida. At the time this Complaint is filed, Plaintiff Tracy resides in Pinellas County, Florida. The device at issue was implanted in Plaintiff Tracy in Florida. Plaintiff Tracy has received medical treatment related to the device in Florida. Plaintiff Tracy had her St. Jude Medical (now Abbott) SCS permanent device implanted on September 17, 2019.

9. **Plaintiff Georgia Marshall** is a resident and citizen of the State of Texas. At the time this Complaint is filed, Plaintiff Marshall resides in Milam County, Texas. The device at issue was implanted in Plaintiff Marshall in Texas. Plaintiff Marshall has received medical treatment related to the device in Texas. Plaintiff Marshall had her St. Jude Medical (now Abbott) SCS permanent device implanted on July 13, 2018.

10. **Plaintiff Holly Johnson** is a resident and citizen of the State of Texas. At the time this Complaint is filed, Plaintiff Johnson resides in Comanche County, Texas. The device at issue was implanted in Plaintiff Johnson in Texas. Plaintiff Johnson has received medical treatment related to the device in Texas. Plaintiff Johnson had her Abbott SCS permanent device implanted on August 22, 2022.

## II. DEFENDANT

11. Defendant Abbott Laboratories is a corporation organized under the laws of the State of Illinois with its principal place of business located in Abbott Park, Lake County, Illinois. Abbott Laboratories is a global healthcare corporation engaged in the design, manufacture, promotion, and sale of medical devices, including spinal cord stimulation systems, throughout the United States, including

in California, Arkansas, Florida, Georgia, Illinois, and Texas. Abbott Laboratories assumed ownership of the SCS device portfolio at issue following its acquisition of St. Jude Medical in 2017.

**JURISDICTION AND VENUE**

12. *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states – specifically, Plaintiffs are domiciled in California, Arkansas, Florida, Georgia, and Texas, whereas Defendant is an Illinois corporation with its principal place of business located in Illinois.

13. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant Abbott Laboratories because it conducts substantial business within this District, and has purposefully availed itself of the privileges of conducting activities within the State of California by maintaining sales representatives in the State, marketing its devices in the State, and causing injuries in the State as a result of the implantation of its devices. This court also has pendent personal jurisdiction over the non-California Plaintiffs' claims as they share a common nucleus of operative facts with the California Plaintiff's claims. Plaintiff Patania, a resident of Chico, Butte County, California, was told by an Abbott sales representative before his permanent implant that the device was "85% positive" in relieving pain, and that representative reprogrammed his permanent device approximately four to five times in response to his complaints that it was not relieving his pain. Plaintiffs Taylor, Cross, Tracy, and Johnson were each implanted with the same Abbott implantable pulse generator model, Model 3660; and Plaintiffs Taylor, Tracy, and Johnson also received the same Abbott lead model, Model 3186, and Plaintiffs Cross and Marshall received the same Abbott paddle lead model, Model 3228; the devices of Plaintiffs Patania, Cross, and Tracy were programmed and/or

reprogrammed by Abbott sales representatives under the same Abbott practice of representative-performed programming in response to patient complaints, and a St. Jude Medical (now Abbott) representative supported the intraoperative programming of Plaintiff Marshall's device; and in each of those cases Abbott's representatives responded to the device's failure by reprogramming the device rather than disclosing known failure modes of Abbott's devices.

14. *Venue.* Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred here, including the implantation of the device in Plaintiff Patania, the programming and repeated reprogramming of Plaintiff Patania's device by Abbott's sales representative in this District, where he resides, and representations made by Abbott's sales representative to Plaintiff Patania in this District. Venue is also proper under the pendent venue doctrine as all Plaintiffs' claims are so unquestionably related to each other that they form part of the same case or controversy. The claims asserted by all plaintiffs undoubtedly show a common nucleus of operative fact, involve common issues of proof, and the existence of many of the same witnesses.

## **FACTUAL ALLEGATIONS**

## **III. APPLICABLE LAW AND CHOICE OF LAW**

15. This Action arises under both federal and state law. Plaintiffs bring state-law claims against Abbott Laboratories for personal injuries sustained as a result of its defective spinal cord stimulator system, which, as to Plaintiff Patania, was marketed, implanted and programmed from within this District.

16. Plaintiff Patania was implanted with the subject device in the State of California, resides in California, and experienced the injuries giving rise to this lawsuit in California.

17. Plaintiff Taylor was implanted with the subject devices in the State of

Arkansas, resides in Arkansas, and experienced the injuries giving rise to this lawsuit in Arkansas.

18. Plaintiff Cross was implanted with the subject device in the State of Georgia, resides in Georgia, and experienced the injuries giving rise to this lawsuit in Georgia.

19. Plaintiff Tracy was implanted with the subject device in the State of Florida, resides in Florida, and experienced the injuries giving rise to this lawsuit in Florida.

20. Plaintiff Marshall was implanted with the subject device in the State of Texas, resides in Texas, and experienced the injuries giving rise to this lawsuit in Texas.

21. Plaintiff Johnson was implanted with the subject device in the State of Texas, resides in Texas, and experienced the injuries giving rise to this lawsuit in Texas.

22. However, significant aspects of the design, manufacture, regulatory strategy, and labeling of the device occurred within the State of Illinois. Defendant Abbott Laboratories is headquartered in Lake County, Illinois, and its spinal cord stimulator operations, including FDA submissions, marketing approvals, and product development, were directed from that location at all relevant times.

23. Under Illinois choice of law principles, courts apply the "most significant relationship" test as set forth in the Restatement (Second) of Conflict of Laws, considering factors such as the place of injury, the place of conduct, the domicile of the parties, and the location where the relationship is centered. *See Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 903 (Ill. 2007).

24. California, Arkansas, Florida, Georgia, and Texas law governs Plaintiffs' personal injury claims respectively, however, to the extent this action concerns Abbott's regulatory decisions, FDA submissions, and corporate conduct

occurring in Illinois, Plaintiffs invoke Illinois law in the alternative for claims that arise from Defendant's forum-based behavior.

## IV. REGULATORY BACKGROUND AND PMA HISTORY

25. The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., requires that all Class III medical devices undergo pre-market approval ("PMA") by the United States Food and Drug Administration ("FDA") before they may be introduced into interstate commerce. The PMA process is the most rigorous pathway under the FDCA and is intended to ensure the safety and effectiveness of devices that support or sustain human life, prevent impairment of human health, or present a potential unreasonable risk of illness or injury.

26. Once a PMA is approved, 21 C.F.R. § 814.39(a) requires that any change to the design, materials, energy source, software, manufacturing process, or labeling of the device that could significantly affect its safety or effectiveness be submitted as a PMA supplement, with the type of supplement – panel-track, 180-day, real-time, or 30-day notice – dictated by the nature and significance of the change and the clinical or preclinical data needed to support it. See 21 U.S.C. § 379i(4)(B)-(D); 21 C.F.R. § 814.39(a), (c). A change of the kind that requires new clinical data to provide reasonable assurance of safety and effectiveness must be submitted as panel-track supplement; a manufacturer may not use an expedited track reserved for minor changes to avoid that clinical data requirement.

27. The spinal cord stimulator (SCS) system implanted in Plaintiffs were marketed under PMA P010032, originally approved in 2001 for a basic neurostimulator system manufactured by Advanced Neuromodulation Systems, Inc. This predicate device consisted of an implantable pulse generator (IPG), fixed stimulation output parameters, a wired programming system, and a battery designed for limited-term use. This predicate system was called the Genesis Neurostimulation (IPG) System.

28. Since that time, Abbott and its predecessors submitted more than 230 PMA supplements, fundamentally transforming the device's internal firmware, waveform architecture, patient interface, battery design, wireless communication, and safety-critical stimulation parameters. Despite these cumulative changes, no new PMA has ever been required or submitted, nor has Abbott conducted and submitted additional safety and efficacy studies. As set forth in Paragraph 29 below, a number of these supplements were processed under the real-time or 30-day notice tracks, which do not require new clinical data, despite describing the kind of significant design, component, or platform changes that 21 U.S.C. § 379i(4)(B) and 21 C.F.R. § 814.39(a) assign to the panel-track process.

29. Upon information and belief, the following PMA supplements illustrate material modifications that independently or cumulatively significantly altered the device's safety and effectiveness:

| **Supplement #** | **Decision Date** | **Supplement Type** | **Device/Model** | **Description / Relevance** |
|---|---|---|---|---|
| S025 | 01/29/2009 | Real-Time Process | Genesis RC & Eon | Design/components/ specification change |
| S028 | 03/19/2009 | 180-Day Track | Eon Mini | Manufacturer/location change |
| S058 | 09/14/2012 | Real-Time Process | Eon Mini | Design/components/ specification change |
| S066 | 03/15/2013 | Real-Time Process | Eon Mini | Design/components/ specification change |
| S068 | 05/17/2013 | Real-Time Process | Eon Mini 2.0 | Design/components/ specification change |
| S073 | 04/25/2014 | 180-Day Track | Eon Mini | Manufacturer/ location change |
| S086 | 11/13/2014 | 30-day notice | Eon Mini / Protégé / Protégé MRI | Platform/device family expansion |
| BurstDR Approval | 10/2016 | Approval | Prodigy / Proclaim Elite | BurstDR therapy approval (new stimulation pattern) |

| | | | | |
|---|---|---|---|---|
| S125 | 07/21/2017 | 180-Day Track | Proclaim IPG Family | Platform evolution, new device family approval |
| S151 | 09/09/2019 | Real-Time Process | Proclaim SCS Family | Labeling change (indications, trade name) |
| Proclaim XR Launch | 09/26/2019 | Press Release | Proclaim XR | Recharge-free, low-dose BurstDR launch |
| S167 | 08/18/2020 | Real-Time Process | SCS IPG | Design/components/ specification change |
| S187 | 08/19/2022 | Real-Time Process | Proclaim SCS | Design/components/ specification change |
| S189 | 01/24/2023 | Panel Track | Prodigy / Proclaim / Proclaim XR | Indication expansion (e.g., DPN) |
| S213 | 06/26/2024 | 180-Day Track | SCS IPG Family | Design/components/ specification change |

30. These changes cumulatively altered the device's mode of action, safety controls, stimulation effects, battery stability, and susceptibility to failure. Abbott did not conduct new clinical trials to validate these design changes and failed to disclose material risks to physicians and patients, including Plaintiffs.

31. On September 11, 2023, the FDA classified five separate Class I recalls of Abbott's Proclaim-series SCS devices, including the Proclaim DRG IPG, XR 5/7 IPGs, and Plus 5/7 IPGs. These recalls were issued in response to complaints from patients experiencing painful electric shocks, sudden device shutdowns, and failure to deliver therapeutic stimulation. These hazards arose from the very firmware, waveform, and interface changes introduced by the above-listed supplements.

32. On May 16, 2024, Abbott initiated a recall of the Proclaim 5 Elite SCS pulse generator due to a product labeling defect. This hazard arose from changes made through the PMA supplementation process.

33. These recalls illustrate that the cumulative effect of Abbott's modifications significantly impacted device performance and patient safety. Abbott had an independent obligation under 21 C.F.R. § 814.39(a) to classify and submit supplements that materially changed the SCS device's design, components, or platform as panel-track supplements supported by new clinical data, as required by 21 U.S.C. § 379i(4)(B). Abbott instead submitted these changes as lesser-tier supplements (real-time, 180-day, 30-day notices), despite adverse event data and prior recalls showing Abbott knew the changes exceeded the scope of its existing approval. As a result, Abbott withheld, from prescribing physicians and patients, material safety information concerning the device's altered risk-benefit profile that Abbott had an independent duty to disclose. Had these changes been submitted for a new PMA, as required by 21 C.F.R. § 814.39(a), the public, medical community, and FDA advisory panels would have had the opportunity to evaluate the altered risk-benefit profile before widespread market use.

34. Instead, Abbott was permitted to bypass that obligation. As a result, Plaintiffs received multiple devices that were fundamentally different from the system described in the original PMA, with undisclosed risks and unvalidated functionality that ultimately failed and caused their significant injury and lasting harm.

35. That decision, coupled with the FDA's tolerance of nearly 250 design-altering PMA supplements over the next 20 years, allowed Abbott to retain the litigation shield of PMA preemption while evading the corresponding regulatory burdens. Plaintiffs do not challenge Congress's establishment of the PMA-supplement regime. Rather, Plaintiffs allege that Defendant obtained approval for the design changes at issue through a series of PMA supplements that FDA classified, at Defendant's request, as lower-level changes to an already-approved device under 21 U.S.C. § 360e(d)(5)(A)(i) and 21 C.F.R. § 814.39(a), even though

those changes, taken together, transformed the device originally approved. FDA's practice of accepting such supplements cannot itself expand the authority Congress conferred through that statutory term, and Defendant cannot rely on FDA's classification of its own submissions to establish that its device, as currently designed and marketed, retains the preemptive protection of the original PMA. The meaning of that statutory term — and whether FDA's classification practice remained within the authority Congress delegated — is a question for this Court's independent judgment under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), not a matter of deference to agency practice.

## V. REGULATORY FRAMEWORK AND FEDERAL DUTIES

36. The FDA regulates Class III medical devices under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq. Class III devices, including spinal cord stimulators, pose the highest risk to patient safety and are subject to the most stringent regulatory controls, including premarket approval ("PMA") and post-market surveillance.

37. Manufacturers of PMA devices may not make changes that affect safety or effectiveness without prior approval of an appropriate PMA supplement: panel-track, 180-day, real-time, or 30-day notice, depending on the significance of the change and the type of data needed to support it. *See* 21 C.F.R. § 814.39(a); 21 U.S.C. § 379i(4)(B)-(D). This regulation imposes a nondiscretionary duty: material changes, whether in firmware, battery chemistry, stimulation parameters, user interfaces, or surgical instrumentation, require full review and public validation.

38. PMA approval also imposes ongoing federal duties, including:

- Postmarket adverse event reporting under 21 C.F.R. Part 803;
- Compliance with design controls (21 C.F.R. § 820.30);
- Manufacturing process validation (21 C.F.R. § 820.75);
- Complaint investigations and corrections under the CAPA rule (21

C.F.R. § 820.100);

- Truthful and non-misleading labeling, updated through 21 C.F.R. § 814.39(d).

39. The spinal cord stimulator implanted in Plaintiffs' bodies were not approved based on independent clinical trial data, but rather on a finding by the FDA that the device was "sufficiently similar" to other SCS systems reported in the literature. *See* Summary of Safety and Effectiveness Data, P010032B, § 1.11. This "sufficient similarity" standard is less rigorous than the "substantial equivalence" requirement for 510(k) Class II clearance. Yet, it served as the evidentiary basis for granting Abbott's devices the powerful preemption protections afforded by PMA status.

40. In 2001, Advanced Neuromodulation Systems (ANS), the original sponsor of this device, submitted a petition asking the FDA to reclassify its SCS system from Class III to Class II. An expert advisory panel reviewed the data and agreed that reclassification was appropriate. The FDA overruled its own panel and denied the petition. Thereafter, the FDA approved the device as a Class III product, based not on new human clinical evidence, but on its alleged similarity to prior-generation devices.

41. That decision, by the FDA to retain Class III status against its own advisory panel's recommendation, coupled with the FDA's tolerance of nearly 250 design-altering PMA supplements over the next 20 years, allowed Abbott to retain the litigation shield of PMA preemption while evading the corresponding regulatory burdens. This conduct exemplifies a dual-track deception: one track for approval, another for modification and marketing.

42. If spinal cord stimulator manufacturers wish to benefit from PMA preemption, they must also bear the burden of compliance. Courts should not allow them to weaponize preemption as both sword and shield while quietly discarding

the regulatory obligations that rationalize and support that protection.

43. The FDA has a statutory duty to prevent this erosion of Class III protections. By permitting Abbott to transform its device architecture without public clinical review, the agency has undermined the integrity of the PMA process.

## VI. PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

44. Plaintiffs Patania, Taylor, Cross, Tracy, Marshall, and Johnson all had similar experiences related to the lack of efficacy of their permanent devices and experienced various additional side effects of the devices, and several had similar experiences related to their interactions with Abbott's sales representatives. Each Plaintiff's claims arise out of the same series of transactions or occurrences: Abbott's manufacture and marketing of its SCS device platforms; Abbott's practice of having its sales representatives, rather than physicians, program and reprogram the SCS devices in response to patient complaints of shocks and loss of relief; and Abbott's failure, through those representatives and otherwise, to disclose known failure modes of its devices, leaving device failures to be attributed to individual, patient-specific causes. Four of the six Plaintiffs (Taylor, Cross, Tracy, and Johnson) received the same Abbott IPG model, Model 3660, and three of them (Taylor, Tracy, and Johnson) received the same Abbott lead model, Model 3186, and Plaintiffs Cross and Marshall received the same Abbott lead model, Model 3228. Common questions of law and fact will arise as to all Plaintiffs, including whether Abbott's leads and IPGs deviated from their approved specifications and whether Abbott failed to report adverse events concerning these failure modes. See Fed. R. Civ. P. 20(a).

**Plaintiff Patania**

45. On or about April 22, 2026, in California, Plaintiff Patania underwent a trial of an Abbott spinal cord stimulator system. The trial device relieved his pain.

46. Before his permanent implant, an Abbott sales representative known

to Plaintiff Patania as "Britney" represented to him that the device was "85% positive" in relieving pain.

47. On or about May 13, 2026, in California, Plaintiff Patania was implanted with a permanent Abbott SCS system consisting of an Abbott implantable pulse generator and Abbott leads.

48. The permanent device has never provided Plaintiff Patania with pain relief. From the day of his permanent implant, he has been in constant pain, "24/7," and the only relief he obtains comes from prescription pain medication.

49. Each time Plaintiff Patania complained of pain, Britney met with him to reprogram the device, which she did approximately four to five times after his permanent implant. None of the reprogramming sessions restored his pain relief, and Britney never told Plaintiff Patania that his lack of relief could be caused by a defect in the device.

50. Plaintiff Patania's device remains implanted as of the filing of this Complaint.

51. Abbott's representative responded to each of Plaintiff Patania's complaints only by reprogramming the device. No one told Plaintiff Patania that his lack of relief could be caused by a defect in the device or was part of a broader pattern of SCS device failures. This led Plaintiff Patania to believe his lack of relief was a programming issue rather than a product defect.

**Plaintiff Taylor**

52. In or about June, 2021, Plaintiff Taylor underwent a trial of an Abbott spinal cord stimulator system at Arkansas Pain Center in North Little Rock, Arkansas. The trial provided her with more than 70% pain relief.

53. On or about June 11, 2021, Plaintiff Taylor was implanted with a permanent Abbott SCS system consisting of an Abbott Proclaim XR 5 implantable pulse generator (Model 3660, Serial No. BTM926.1) and Abbott leads at Arkansas

Outpatient Surgery Center in North Little Rock, Arkansas.

54. The permanent device did not provide the relief the trial had provided. Plaintiff Taylor reported to her pain-management provider that the permanent device was “not as good as” the trial device. Her pain was not relieved and worsened, and she suffered a burn from the device.

55. On or about August 21, 2023, Plaintiff Taylor underwent revision surgery because her Abbott leads had malfunctioned at Arkansas Outpatient Surgery Center in North Little Rock, Arkansas. Both leads were found to need replacement, and both were replaced (Model 3186, Serial Nos. 50005580 and 20044426).

56. Less than three months later, Plaintiff Taylor developed an infection of the SCS system, with cellulitis of her lower back, severe 10-out-of-10 pain at the device site, fever, and chills. On November 8, 2023, at Baptist Health Medical Center–North Little Rock in North Little Rock, Arkansas, Plaintiff Taylor underwent surgical removal of the generator and leads, with irrigation and debridement of the wound; pus was found at both the generator site and the lead pocket. She was hospitalized from November 8 through November 11, 2023, for the removal, intravenous antibiotics, and wound care, and was discharged on a four-week course of oral antibiotics.

57. Plaintiff Taylor continues to suffer chronic pain and lumbar radiculopathy.

58. Plaintiff Taylor’s providers attributed her November 2023 complications to a wound infection. No one told Plaintiff Taylor that her lead failure, lack of relief, or other injuries could be caused by a defect in the device or were part of a broader pattern of SCS device failures. This led Plaintiff Taylor to believe her experience was an individual outcome rather than a product defect.

**Plaintiff Cross**

59. In or about June 2019, in Georgia, Plaintiff Cross underwent a trial of an Abbott spinal cord stimulator system. By July 9, 2019, he reported that the trial had been very effective.

60. On or about July 22, 2019, in Georgia, Plaintiff Cross was implanted with a permanent Abbott SCS system consisting of an Abbott Proclaim 5 Elite implantable pulse generator (Model 3660, Serial No. BFS407.1) and an epidural Abbott Penta paddle lead (Model 3228, Serial No. 18110856). The implant was performed by Michael Neil Woodall, M.D., of Georgia Neurological Surgery & Comprehensive Spine in Athens, Georgia.

61. Approximately two weeks after the implant, Plaintiff Cross began experiencing electric shocks in his face and shoulders and reported that the device was not effective.

62. Plaintiff Cross then developed a tremor, weakness in both hands, numbness and tingling in both hands, new spasms in both arms, clumsiness in his hands that made it difficult for him to text, numbness in his right arm that was worse than before the implant, intermittent severe headaches, pain radiating into his shoulders, and balance problems. His providers diagnosed cervical myelopathy and spinal cord compression, which they attributed at least in part to the Abbott epidural paddle.

63. On or about October 28, 2019, in Georgia, Plaintiff Cross underwent surgical revision of the paddle and a C3–C5 laminoplasty, performed by Dr. Woodall. Following the revision, he suffered a low-grade fever, nausea, migraine headaches, and a red, warm incision.

64. On or about December 12, 2019, because Plaintiff Cross continued to suffer right-arm causalgia and myelopathy symptoms, an Abbott representative changed his stimulator settings, and further programming changes were made in

response to his evolving symptoms. The reprogramming did not resolve his symptoms. At his providers' direction, Plaintiff Cross turned the stimulator off for approximately a week; his tremor, clumsiness, weakness, and neck pain did not improve.

65. On or about November 18, 2024, at Pain Management Specialists of Atlanta in Stockbridge, Georgia, Plaintiff Cross underwent surgical removal of the SCS device.

66. Plaintiff Cross's providers attributed his symptoms to the presence of the paddle in his spinal canal as a foreign body and to his underlying cervical spondylosis, and Abbott's representative responded to his continuing symptoms by changing his stimulator settings. No one told Plaintiff Cross that his symptoms could be caused by a defect in the device or were part of a broader pattern of SCS device failures. This led Plaintiff Cross to believe his experience was a surgical complication unique to him rather than a product defect.

**Plaintiff Tracy**

67. On September 17, 2019, Plaintiff Tracy was implanted with a permanent St. Jude Medical (now Abbott) SCS system consisting of a St. Jude Medical Proclaim 5 Elite implantable pulse generator (Model 3660, now marketed as the Proclaim XR 5, Serial No. BGP245.1) and St. Jude Medical leads (Model 3186, Serial Nos. 18256383 and 18256320) placed at the T8 level, at Alleviate Pain in Pinellas Park, Florida. The implant was performed by Raviinder Singh Parmar, M.D.

68. The permanent device did not relieve Plaintiff Tracy's pain. Beginning in or about mid-2021, her pain increased, and she has experienced burning and electric-shock sensations and dizziness from the device.

69. On October 24, 2022, Plaintiff Tracy's stimulator was turned up to its highest level, with no improvement in her back pain. On November 21, 2022, at

Alleviate Pain in Saint Petersburg, Florida, her device was reprogrammed in an effort to obtain better coverage.

70. Plaintiff Tracy's leads then migrated. On September 11 and 12, 2023, at Advanced Surgical Care of Clearwater in Clearwater, Florida, Plaintiff Tracy underwent surgical revision of the spinal electrode array and revision of the implantable pulse generator. Following the revision, an Abbott representative reprogrammed her device.

71. In or about November 2023, Plaintiff Tracy's device began "firing off." Her provider told her he had never seen that happen before and repaired the device rather than replacing it.

72. On November 17, 2023, at Alleviate Pain in Saint Petersburg, Florida, Plaintiff Tracy met with an Abbott representative and reported persistent low-back pain at the generator site and that the device was shocking her. Her device was reprogrammed at that visit, which gave her only slight relief. At a later visit, at which an Abbott representative again met with her, she reported no relief, continuing pain at the generator site, and shocking.

73. On or about November 20, 2024, at Advanced Surgical Care of Clearwater in Clearwater, Florida, after a period in which the device was turned off to assess whether it was providing any benefit, Plaintiff Tracy underwent surgical removal of the SCS device because of pain at the generator site. She developed an infection at the surgical site after the removal, with redness, tenderness, and drainage at the incision, for which she was treated with a course of oral antibiotics.

74. Plaintiff Tracy continues to suffer severe, persistent low-back pain.

75. Plaintiff Tracy's providers attributed her problems to lead migration and treated them with revision surgery. After the revision, she was told that the pain at her generator site "should continue to improve," and when her device began firing off, her provider told her he had never seen that happen before and repaired it rather

than replacing it. Abbott's representatives, who met with her and reprogrammed her device after the revision and again in November 2023, did not disclose any defect. No one told Plaintiff Tracy that her symptoms could be caused by a defect in the device or were part of a broader pattern of SCS device failures. This led Plaintiff Tracy to believe her experience was an individual outcome rather than a product defect.

**Plaintiff Marshall**

76. On May 3, 2018, Plaintiff Marshall underwent a trial of a St. Jude Medical (now Abbott) spinal cord stimulator system with two eight-electrode leads at Cedar Park Surgery Center in Cedar Park, Texas. The trial provided her with approximately 70–80% pain relief.

77. On July 13, 2018, Plaintiff Marshall was implanted with a permanent St. Jude Medical (now Abbott) SCS system consisting of a non-rechargeable St. Jude Medical implantable pulse generator placed in her left buttock, and a paddle lead (Model 3228, Serial No. 17385708), at Cedar Park Surgery Center in Cedar Park, Texas. A St. Jude Medical representative, Stacy Shwedel, was present in the operating room and provided device support during the intraoperative programming of the generator.

78. In 2023, Plaintiff Marshall began experiencing electric shocks through her body and groin. The device's battery was tested and the device was reprogrammed by an Abbott representative, but the reprogramming did not stop the shocks. At around the same time, she began experiencing a "bugs crawling" sensation, which has persisted.

79. Beginning in or about February 2024, Plaintiff Marshall suffered recurrent urinary tract infections, and beginning on or about May 31, 2024, she suffered urinary incontinence. She has also experienced muscle weakness in her upper and lower limbs, chronic diarrhea, and ineffective and worsening pain.

80. In December 2024, Plaintiff Marshall's provider diagnosed migration of the stimulator as an adverse event, and she was referred for removal of the device and was to meet with Dr. Paterno about the removal.

81. Plaintiff Marshall's device remains implanted as of the filing of this Complaint.

82. Plaintiff Marshall initially attributed her incontinence to causes unrelated to the device. When she raised her symptoms with her physician, she was told she would need to explore the question with her pain-management physician, and she was told that her device's battery had been checked and "was good." Her symptoms were treated individually, as incontinence, urinary tract infections, and sensory complaints. No one told Plaintiff Marshall that her symptoms could be caused by a defect in the device or were part of a broader pattern of SCS device failures. This led Plaintiff Marshall to believe her experience was an individual outcome rather than a product defect.

**Plaintiff Johnson**

83. In or about July 2022, Plaintiff Johnson underwent a trial of an Abbott spinal cord stimulator system. The trial provided her with approximately 80% pain relief.

84. On August 22, 2022, following a preoperative assessment on August 18, 2022, Plaintiff Johnson was implanted with a permanent Abbott SCS system consisting of an Abbott Proclaim XR 5 implantable pulse generator (Model 3660, Serial No. CDM414.1) and Abbott leads (Model 3186, Serial Nos. 19418088 and 19417683) at Integrated Pain Associates in Abilene, Texas.

85. The permanent device did not provide the relief the trial had provided. On September 6, 2022, Plaintiff Johnson reported much less relief from the permanent device than from the trial, persistent right-leg pain, inadequate stimulation coverage, and irritation at the wound. Her provider instructed her to turn

the device off for 24 hours and then restart it.

86. On September 20, 2022, Plaintiff Johnson reported continued right-leg pain and inadequate relief despite programming of the device, and she was again instructed to turn the device off for 24 hours and restart it. On October 18, 2022, she reported continued poor relief, and a lumbar MRI was ordered.

87. On December 19, 2023, because conservative therapies, including the SCS device, had failed to resolve her pain, Plaintiff Johnson was referred back for neurosurgical evaluation. On January 2, 2024, she reported ongoing pain despite the SCS device. A lumbar MRI on January 10, 2024, showed the stimulator entering the spinal canal at T11–T12.

88. On March 4, 2024, at Neurosurgery Associates of West Texas, a neurosurgeon recorded that the trial had provided Plaintiff Johnson approximately 80–90% relief but the permanent device only 15–20% relief, that repeated programming had been unsuccessful, and that revision or removal of the device was under consideration. The next day, she reported that the neurosurgeon had questioned the location of the stimulator and had discussed removing the leads and generator and potentially replacing the system.

89. Plaintiff Johnson's device remains implanted as of the filing of this Complaint.

90. Plaintiff Johnson's lack of relief was met with repeated, unsuccessful reprogramming of the device and instructions to turn it off and restart it, and her providers treated her continuing pain as a failure of conservative therapies. When a neurosurgeon later questioned the stimulator's location, he discussed revising or replacing the system. No one told Plaintiff Johnson that her lack of relief could be caused by a defect in the device or was part of a broader pattern of SCS device failures. This led Plaintiff Johnson to believe her experience was an individual outcome rather than a product defect.

91. All leads used in the SCS systems implanted in Plaintiffs were manufactured and sold by Abbott or its predecessors.

92. As a direct and proximate result of the defective and misrepresented nature of the device, Plaintiffs suffered physical injury, worsening pain, emotional distress, and economic damages including medical expenses and loss of quality of life.

93. Plaintiffs discovered the probable causal relationship between their injuries and Abbott's conduct only after experiencing continued device-related complications, removal of the device (as to Plaintiffs Taylor, Cross, and Tracy), and finally being informed about the underlying facts of the SCS that contradicted Abbott's representations.

94. Until Plaintiffs learned the underlying facts of the safety and efficacy of Abbott's SCS devices, they continued to believe that their conditions and the efficacy of the devices were an aberration limited to themselves and not caused by a pattern and practice of Abbott.

95. During all times relevant to this Complaint Abbott fraudulently concealed from Plaintiffs the truth regarding the safety and efficacy of the SCS devices, and Plaintiffs could not have, with reasonable due diligence, determined such truth. In fact, to this day, Abbott continues to insist that its SCS devices are safe and efficacious.

## VII. ADDITIONAL FACTUAL ALLEGATIONS SUPPORTING LIABILITY

96. At all times relevant to this Complaint, Abbott Laboratories or its predecessors were responsible for the design, manufacture, testing, labeling, promotion, sale, post-market surveillance, and regulatory compliance of the spinal cord stimulator (SCS) systems implanted in Plaintiffs.

97. The devices marketed to Plaintiffs and their healthcare providers as the

Proclaim SCS systems bore little resemblance to the device originally approved under PMA P010032. These devices incorporated multiple significant changes to their hardware, firmware, user interface, waveform architecture, battery system, and wireless programming, each of which materially impacted the devices' safety, performance, and failure modes.

98. Despite these changes, Abbott never submitted a new PMA. Instead, the company submitted more than 230 piecemeal supplements—many of which were processed under expedited review programs, including 30-day notices and real-time reviews—avoiding panel-track scrutiny and clinical revalidation.

99. Abbott failed to disclose that the devices implanted in Plaintiffs' bodies had never been tested through a full PMA-level clinical trial in human patients. The original approval of PMA P010032 was based not on manufacturer-sponsored trials, but on FDA conclusions that the Genesis system was "sufficiently similar" to other devices discussed in the literature. This flawed evidentiary standard was accepted by the FDA only after it overruled its own expert advisory panel, which had recommended reclassifying SCS devices from Class III to Class II.

100. Abbott relied on the full preemption shield of PMA status to market its device as safe and effective, while knowingly and repeatedly altering the system beyond what was originally validated. It failed to notify physicians or patients that the implanted device:

- Used firmware-dependent control systems absent from the predicate;
- Allowed smartphone-based patient programming via Bluetooth;
- Delivered burst and high-frequency stimulation patterns not subject to human testing under the PMA;
- Was affected by lead migration, high lead impedance, communication delays, and lead short circuits, as documented in MAUDE reports and

adverse event summaries.

101. As previously alleged, between 2020 and 2023, Abbott initiated multiple recalls involving the Proclaim system. On September 11, 2023, the FDA classified five recalls of Abbott's Proclaim XR and Proclaim DRG IPGs as Class I—its most serious category, reserved for devices that may cause serious injury or death. The recalled devices included the Proclaim XR 5 IPG, Model 3660 (previously marketed as the Proclaim 5 Elite), the IPG model implanted in Plaintiffs Taylor, Cross, Tracy, and Johnson.

102. These recalls were issued in response to patient complaints of:

- Painful electrical shocks;
- Sudden unintended stimulation;
- Loss of therapy;
- Device failure during recharging;
- Malfunctioning wireless communication and programming failures.

103. These malfunctions were directly linked to design and firmware changes made in PMA supplements between 2017 and 2022, including supplements S036 (Bluetooth programming), S043 (Proclaim XR rebranding), and subsequent firmware updates approved in S051–S062. Abbott knew or should have known that these cumulative changes significantly altered the device's safety and effectiveness.

104. On May 16, 2024, Abbott initiated a recall of the Proclaim 5 Elite SCS pulse generator due to a product labeling defect, arising from product labeling changes it had made to the device in Supplement S151. The product labeling of the Proclaim Elite SCS system was never subjected to PMA review and scrutiny.

105. Abbott failed to update product labeling, device manuals, or promotional materials to reflect the true performance characteristics of the altered device. Nor did it warn physicians or patients of the risks of stimulation failure, lead migration, high lead impedance, lead short circuits, nerve damage, and device

failure—despite mounting adverse event reports and internal design change documentation.

106. Abbott also failed to maintain adequate design validation and risk analysis documentation as required under 21 C.F.R. § 820.30(g), and failed to investigate and address post-market complaints as required by 21 C.F.R. § 820.198 and § 820.100.

107. These violations of FDA-mandated Current Good Manufacturing Practices (cGMPs) were not isolated or inadvertent. They reflect a systemic disregard for regulatory obligations, a practice of iterative design without public revalidation, and a prioritization of market expansion over patient safety.

108. The defects in the Proclaim systems, their design, firmware, labeling, and risk disclosure, were a direct and proximate cause of Plaintiffs' injuries. These defects existed at the time the device left Abbott's control and were not known or reasonably knowable to Plaintiffs or their physicians at the time of implantation.

109. At all relevant times, Plaintiffs used the product as intended and in a foreseeable manner. The product failed to perform as represented, and the manifested risks were not disclosed in the device's labeling, Instructions for Use (IFU), or patient education materials.

110. Abbott's conduct was knowing, deliberate, and reckless. It knowingly placed a materially altered medical device into the stream of commerce, misrepresented its safety and approval status, and failed to correct known defects through regulatory pathways available under federal law.

111. Upon information and belief, the Proclaim SCS system and related system components implanted in Plaintiffs deviated from Abbott's FDA-approved manufacturing specifications for firmware execution stability, wireless programming reliability, lead and IPG fixation, and IPG output. These deviations resulted in stimulation shutoff, painful electric shocks, and therapy loss, all of which

Plaintiffs experienced and have been reported by other users of the same device model.

112. The malfunctions leading to recalls of the Proclaim system reflect systemic deficiencies in Abbott's manufacturing processes and a failure to conform to its Quality System Regulation (QSR) obligations under 21 C.F.R. §§ 820.30(g), 820.75, 820.198, and 820.100. Abbott failed to adequately validate or monitor these performance characteristics post-market, despite prior complaints and adverse event reports.

113. The devices implanted in Plaintiffs were not reasonably safe at the time they left Abbott's and its predecessor's control, and their malfunction during regular use, which included loss of therapy and the need for surgical revision and/or removal for certain Plaintiffs, were a direct and foreseeable consequence of Abbott's failure to ensure adherence to its approved manufacturing controls. Plaintiffs' injuries were not caused by a known or disclosed risk; rather, they stemmed from defects in the execution of the product's firmware and power management systems, which were neither tested nor monitored in accordance with binding federal regulations. Moreover, these injuries resulted from latent manufacturing deviations, particularly in lead integrity, firmware execution, and power management, that were not reflected in labeling or IFU and were undetectable by implanting physicians.

## VIII. ABBOTT'S FAILURE TO REPORT ADVERSE EVENTS AND DIRECT COMMUNICATIONS WITH PLAINTIFFS

114. Federal law requires a device manufacturer to report to FDA within 30 calendar days: information that reasonably suggests that its marketed device may have caused or contributed to a serious injury or has malfunctioned and would be likely to cause or contribute to a serious injury if the malfunction were to recur. 21 C.F.R. § 803.50(a).

115. Before each Plaintiff's implantation, Abbott received complaints and other information reasonably suggesting that its Proclaim IPGs and associated leads had malfunctioned or caused serious injury through painful shocks, high lead impedance and lead short circuits, lead migration and IPG rotation, and loss of therapy. Upon information and belief, Abbott failed to report a substantial number of these events to FDA, reported them late, or characterized them in a manner that obscured the device's role.

116. Abbott's own MDRs to FDA confirm that Abbott knew of these failure modes before the implantations of Plaintiffs Taylor, Johnson, and Patania. Abbott's reports of high lead impedance, device and lead migration, and loss of therapy in its Proclaim IPGs predate the implants of Plaintiffs Taylor, Johnson, and Patania. See, e.g., MDR No. 1627487-2020-32070 (high impedance; IPG inoperable; system explanted and replaced; received by FDA October 1, 2020). Counting only publicly-available, Abbott-filed reports for Proclaim IPGs, Model 3660, received by FDA between September 30, 2020 (when reports filed under the Abbott Medical name first appear for that model) and December 31, 2024, Abbott reported at least 104 events involving high or abnormal lead impedance, 91 involving device or lead migration, and 17 involving shocks before Plaintiff Patania's May 13, 2026 implant. Model 3660 is the same IPG model implanted in Plaintiffs Taylor, Cross, Tracy, and Johnson, and these reports describe the same failure modes those Plaintiffs experienced: shocks (Plaintiffs Cross and Tracy), lead migration (Plaintiff Tracy), lead malfunction requiring replacement (Plaintiff Taylor), and inadequate or lost therapeutic relief (all four). See, e.g., MDR Nos. 1627487-2024-07658 (high impedance and shocks at the IPG site that resolved when the system was turned off; system explanted); 1627487-2024-00581 (high impedance and loss of therapy; patient "did not report any falls or traumas"); 1627487-2021-02127 (migration; patient "denied any recent trauma").

117. Abbott repeatedly characterized such events in its reports in a manner that obscured the device's role. Abbott coded reports describing high lead impedance, shocks, and lead migration as "Adverse Event Without Identified Device or Use Problem," see, e.g., MDR Nos. 1627487-2024-07197, 1627487-2024-10072, 1627487-2024-12604, and closed the substantial majority of its Proclaim IPG investigations as "inconclusive" because the device was "not returned for analysis."

118. Abbott's handling of the MRI-mode failure illustrates the pattern. As early as November 2020, Abbott reported a Proclaim IPG that was stuck in MRI mode and "could not be recovered," which Abbott attributed to its own representative's deletion of pairing data from the clinician programmer, and coded the event as a "Wireless Communication Problem." See MDR No. 1627487-2020-48065 (received November 20, 2020). Beginning in April 2021, Abbott filed reports describing Proclaim IPGs that could not be taken out of MRI mode and required surgical replacement, see, e.g., MDR Nos. 1627487-2021-13410 (event March 26, 2021), 1627487-2021-17984, 1627487-2021-18593, but coded them as a generic "Wireless Communication Problem" and attributed them to patient or programmer issues. After issuing what its own MDRs describe as its June 22, 2023 advisory notice, Abbott filed, on or about July 19–20, 2023, approximately 24 reports of the same failure involving events that occurred between 2017 and 2023, including MDR Nos. 1627487-2023-03439 (March 14, 2017 event), 1627487-2023-03449 (April 26, 2018 event), 1627487-2023-03447 and -03448 (October 2021 events), and 1627487-2023-03460, -03462, and -03477 (June 2022 events). Abbott issued that advisory before Plaintiff Patania's implant, and its earliest reports of this failure predate the implants of Plaintiffs Taylor and Johnson. Several of those late-filed reports involve events that occurred in March 2017 and April 2018, before the 2019 implants of Plaintiffs Cross and Tracy, yet Abbott did not report them to FDA until

July 2023. Model 3660, the IPG implanted in Plaintiffs Taylor, Cross, Tracy, and Johnson, was among the IPGs Abbott recalled in 2023 because they could not exit MRI mode, a recall FDA classified as Class I. Abbott's reports also show that it knew Proclaim IPGs could fail to enter MRI mode at all: before Plaintiff Patania's implant, Abbott filed at least 16 reports of Proclaim IPGs that could not be placed into MRI mode, at least 14 of which involved abnormal lead impedance, and many of which resulted in surgical explant or replacement of the system. See, e.g., MDR Nos. 1627487-2020-48338 (system unable to enter MRI mode due to impedance problems; entire system explanted and replaced; received by FDA November 28, 2020); 1627487-2021-02339 (patient unable to place IPG into MRI mode; one lead had high impedance and had fractured); 1627487-2021-15417 (system would not go into MRI mode due to low impedance; patient needed MRI; system explanted).

119. Before any Plaintiff's implantation, Abbott had already issued at least two physician advisories acknowledging device failures in the Proclaim IPG family that required surgical replacement. These advisories show that Abbott knew, before all Plaintiffs' implantations, that firmware and software defects in the Proclaim IPG platform were causing device failures requiring surgical replacement. Abbott's own MDRs describe these advisories as its June 2, 2017 notice that its neuromodulation IPGs could become inoperable when exposed to monopolar electrosurgery and its September 12, 2017 notice of an inaccurate elective replacement indicator, both of which predate every Plaintiff's implant. Abbott later issued its June 22, 2023 advisory concerning IPGs unable to exit MRI mode and its May 3, 2024 advisory concerning a late elective replacement indicator message, both before Plaintiff Patania's implant.

120. Information reported to FDA under 21 C.F.R. Part 803 is published in FDA's MAUDE database, which is searchable by device and by reported device problem, and the FDA regularly publishes manufacturers' reports there. Physicians

who implant and manage SCS devices, including Plaintiffs' implanting and treating physicians, rely on MAUDE data, FDA safety communications, and the medical literature drawing on them in selecting devices, counseling patients, and evaluating device complaints. Because Abbott failed to report, reported late, or coded these events as involving no identified device problem, the MAUDE data available to Plaintiffs' physicians understated the frequency of, and masked the device's role in, the same failure modes each Plaintiff later experienced. Had Abbott timely and accurately reported these events, that information would have reached Plaintiffs' physicians, and (a) the physicians would not have recommended the Abbott SCS systems, or would have disclosed these risks to Plaintiffs, who would not have consented to implantation; and (b) after implantation, when each Plaintiff reported shocks, loss of coverage, or migration, the physicians would have recognized those symptoms as device failures and revised or explanted the device sooner, rather than permitting repeated reprogramming or by reassurance by Abbott's representatives, sparing Plaintiffs months of ineffective and painful therapy.

121. The applicable law of each Plaintiff's state imposes on manufacturers a general duty to use reasonable care and to warn of risks they know or should know of, a duty that may be discharged by conveying the information to a third party, such as FDA, through which it will reach the physicians and patients whose safety depends on it. Abbott breached that duty by failing to timely and accurately submit the adverse event reports required by 21 C.F.R. § 803.50(a), as alleged above. That duty is a traditional state-law duty owed to Plaintiffs; it exists independently of, and predates, the federal reporting requirements. Plaintiffs do not contend that state law required Abbott to give physicians or patients any warning beyond what federal law requires. Plaintiffs' failure-to-warn and negligence claims rest in part on Abbott's failure to report adverse events to FDA as federal law required, a duty that parallels, and is no broader than, Abbott's federal reporting obligations.

122. In addition, Abbott's representatives communicated directly with Plaintiffs regarding the devices' expected performance and the reprogramming of their devices, including Representative Britney's pre-implant statement to Plaintiff Patania that the device was "85% positive" in relieving pain, and her approximately four to five reprogramming sessions with him, each prompted by his complaints of continuing pain; an Abbott representative's changes to Plaintiff Cross's stimulator settings in response to his continuing arm pain and myelopathy symptoms; Abbott representatives' reprogramming of Plaintiff Tracy's device after her September 2023 revision and their meetings with her in November 2023 and afterward, when she complained of shocking and pain at the generator site; and the presence of St. Jude Medical (now Abbott) representative Stacy Shwedel in the operating room to support the intraoperative programming of Plaintiff Marshall's device. These communications were made directly to Plaintiffs and not to or through any learned intermediary.

## CAUSES OF ACTION

## COUNT I: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT

(Applicable State Product Liability Law)

123. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

124. At all times relevant to this action, Abbott Laboratories (hereafter reference to Abbott Laboratories shall include any applicable predecessor company, including St. Jude Medical) was engaged in the business of designing, manufacturing, testing, labeling, distributing, and selling medical devices, including the spinal cord stimulator systems implanted in Plaintiffs.

125. The devices implanted in Plaintiffs were not reasonably safe for their intended use due to a manufacturing defect. The products, as manufactured and

sold, deviated from Abbott's own FDA-approved specifications and did not conform to the design and performance standards described in PMA P010032 and its associated supplements.

126. Specifically, as detailed in preceding allegations, the Proclaim systems implanted in Plaintiffs failed to conform with federal Quality System Regulations, including 21 C.F.R. §§ 820.30(g) (design validation), 820.75 (process validation), 820.100 (corrective and preventive action), and 820.198 (complaint handling). These violations resulted in defects in lead integrity (including high lead impedance and lead short circuits), lead and IPG fixation, and firmware execution.

127. These deviations were not theoretical. Plaintiffs' implanted device failed during normal and foreseeable use, producing painful sensations, stimulation loss, and other adverse effects that led to surgical revision and/or removal for certain Plaintiffs and permanent injury.

128. Plaintiffs' injuries were not caused by a known or inherent risk of the device when properly manufactured, but rather by a departure from its intended and approved construction. The product failed to perform as represented, and it would not have failed but for Abbott's failure to comply with FDA-mandated specifications and manufacturing protocols.

129. Under California, Arkansas, Florida, Georgia, Illinois, and Texas law, Abbott is strictly liable for injuries caused by a manufacturing defect that rendered the device unreasonably dangerous at the time it left its control.

130. As a direct and proximate result of the manufacturing defect in the device, the Plaintiffs suffered physical injury, pain, medical expenses, loss of enjoyment of life, and other damages.

**<u>COUNT II: STRICT PRODUCTS LIABILITY – FAILURE TO WARN</u>**

(Failure to Warn Under Applicable State Law)

131. Plaintiffs incorporate by reference allegations set forth above as

though fully set forth herein.

132. At all times relevant, Abbott Laboratories had a duty to provide adequate warnings and instructions regarding the known or reasonably foreseeable risks associated with its spinal cord stimulator system, including the Proclaim systems.

133. Under California, Arkansas, Florida, Georgia, Illinois, and Texas law, a product is defective if it is unreasonably dangerous due to the absence of adequate warnings or instructions. This duty extends to risks known or knowable in light of the scientific, clinical, or regulatory knowledge available at the time the product was marketed and distributed.

134. The spinal cord stimulator devices implanted in Plaintiffs were materially altered from the system originally approved under PMA P010032. The systems they received included firmware-driven stimulation control, Bluetooth-enabled programming interfaces, and high-density waveform functionality that were never clinically validated in human trials or publicly disclosed at the time of approval.

135. Abbott failed to update its Instructions for Use (IFU), patient education materials, and physician-facing labeling to disclose: the risk of painful stimulation spikes or loss of therapy due to high lead impedance and lead short circuits; the instability of firmware updates and potential for loss of device communication; the risk of lead migration and IPG rotation in the absence of trauma; the risk that the device could not exit MRI mode; the increased rate of lead migration and therapy failure reported post-market; the cumulative nature of the device's evolution, and that its current form bore little resemblance to the device described in PMA P010032 or its Summary of Safety and Effectiveness Data.

136. The failure to warn was compounded by Abbott's internal knowledge of these risks, including MAUDE reports, post-market complaint data, and prior

design and validation issues. Despite this knowledge, Abbott continued to represent the device as "safe and effective" and failed to initiate field safety notifications, device labeling changes, or provider education consistent with 21 C.F.R. § 814.39(d) or 21 C.F.R. § 820.198.

137. Independently, Abbott breached its state-law duty to warn by failing to timely and accurately report adverse events to FDA as required by 21 C.F.R. Part 803, as alleged above in Section VIII.

138. Plaintiffs and their healthcare providers reasonably relied on Abbott's representations and omissions in deciding to proceed with implantation of the SCS devices. Had they been adequately warned of the known risks, the device would not have been implanted, or alternative treatments would have been pursued.

139. Plaintiffs' injuries were caused in whole or in part by Abbott's failure to warn of known or knowable dangers associated with the use of its product. These failures rendered the device unreasonably dangerous for its intended use and constitute a defect under California, Arkansas, Florida, Georgia, Illinois, and Texas law.

140. As a direct and proximate result of Abbott's failure to warn, Plaintiffs suffered physical injury, pain, medical costs, surgical intervention, emotional distress, and other damages.

## COUNT III: NEGLIGENCE PER SE – FEDERAL REGULATORY VIOLATIONS

(Under Applicable State Law)

141. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

142. Under California, Arkansas, Florida, Georgia, Illinois, and Texas law, a person injured by the violation of a statute or regulation intended to protect the class of persons to which that person belongs may recover damages under a theory

of **negligence per se**.

143. Abbott Laboratories was subject to, and violated, multiple non-discretionary federal duties that were enacted for the protection of public health and safety. These duties are embodied in the Food, Drug, and Cosmetic Act (FDCA), the Medical Device Amendments of 1976, and FDA regulations promulgated thereunder, including:

**21 C.F.R. § 814.39(a)** – requiring a PMA supplement, with the review track (panel-track, 180-day, real-time, or 30-day notice) determined by the significance of the change and the clinical data needed to support it before implementing changes that may affect device safety or effectiveness;

**21 C.F.R. § 803.50** – mandating adverse event reporting;

**21 C.F.R. § 820.30(g)** – requiring design validation under expected use conditions;

**21 C.F.R. § 820.75** – requiring process validation to ensure consistent device output;

**21 C.F.R. § 820.198** – requiring investigation of complaints;

**21 C.F.R. § 820.100** – mandating corrective and preventive action (CAPA) when product failures are identified;

**21 C.F.R. § 814.39(d)** – requiring labeling updates in response to known risks.

144. State common law independently imposes on manufacturers of implantable medical devices a duty to design, validate, and monitor their products with reasonable care, and to investigate and act on known safety complaints; that duty exists independent of, and is not created by, the FDCA or its implementing regulations. The federal regulatory violations alleged herein are pled as evidence of the standard of care applicable to an independently existing state-law duty, as the source of a specific, ascertainable requirement that parallels a pre-existing state-law

duty, not as an attempt to enforce the FDCA itself or to impose a requirement different from, or in addition to, the requirement the FDCA already imposes on Abbott.

145. These devices implanted in Plaintiffs materially deviated from the system approved in PMA P010032. They incorporated design and firmware changes that altered their safety profile, yet Abbott failed to submit a new PMA or a panel-track supplement, as required by 21 U.S.C. § 379i(4)(B) and 21 C.F.R. § 814.39(a), (c). Abbott instead submitted piecemeal supplements and exploited expedited review programs to bypass clinical safety validation.

146. Abbott also failed to report adverse events linked to stimulation shutoff, therapy loss, and electrical shocks under 21 C.F.R. § 803.50. These adverse effects were known to Abbott prior to Plaintiffs' implantation and were consistent with reports subsequently leading to Class I recalls in 2023.

147. Abbott violated design and manufacturing regulations by failing to validate the performance of its firmware-dependent stimulation control, Bluetooth-based programming, and battery recharging systems. It also failed to initiate CAPA processes in response to known problems, and did not investigate or disclose known product complaints in accordance with 21 C.F.R. §§ 820.100 and 820.198.

148. Each of these violations constitutes a breach of federal laws that were designed to protect a class of persons, of which Plaintiffs are members, against a particular type of harm.

149. Plaintiffs are members of the class of persons these statutes and regulations are intended to protect: patients receiving high-risk Class III medical implants under the FDA's PMA regulatory framework. Plaintiffs' injuries are of the type these laws are intended to prevent—namely, harm resulting from undisclosed and unremedied device malfunctions that occur due to failures in quality systems, post-market reporting, and product validation.

150. As a direct and proximate result of Abbott's violations of federal regulations and California, Arkansas, Florida, Georgia, Illinois, and Texas law, Plaintiffs suffered compensable physical injury, pain, medical costs, loss of enjoyment of life, and other damages.

151. These regulatory violations were not merely technical infractions, but material breaches of duties specifically intended to prevent the type of harm suffered by Plaintiffs—namely, therapy loss, neurological injury, and delayed surgical intervention due to systemic firmware and charging failures.

## COUNT IV: BREACH OF EXPRESS WARRANTY

(Under Applicable State Law)

152. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

153. Under Illinois law, an express warranty is created when a seller makes an affirmation of fact or promise to the buyer that relates to the goods and becomes part of the basis of the bargain. *See* 810 ILCS 5/2-313; *Happel v. Wal-Mart Stores, Inc.*, 766 N.E.2d 1118, 1123–24 (Ill. 2002). California, Arkansas, Florida, Georgia, and Texas law are in accord.

154. Prior to the implantation of the Proclaim spinal cord stimulator devices, Abbott Laboratories made explicit representations in its promotional materials, device labeling, IFU, public statements, and directly to Plaintiffs through its sales representatives that the device was safe, effective, reliable, and had been adequately tested for use in human patients suffering from chronic pain.

155. Abbott expressly warranted that its SCS devices provided consistent pain relief, seamless therapy delivery, safe wireless programming, and a rechargeable platform with superior reliability and patient comfort. Abbott's provider materials represented that its SCS systems were "FDA-approved," "clinically validated," and "designed for long-term use with low complication

rates." These claims were repeated in sales brochures, website copy, and Abbott's physician training materials. Abbott's sales representative made such representations directly to Plaintiff Patania before his implant decision, including that the device was "85% positive" in relieving pain. Upon information and belief, consistent with Abbott's practice of having its representatives attend implant procedures and program its devices, Abbott's representatives made similar representations to the other Plaintiffs or their implanting physicians before their implant decisions.

156. These affirmations and promises became part of the basis of the bargain between Abbott and Plaintiffs, as well as Plaintiffs' implanting physician. Plaintiffs and their physician relied on these representations to proceed with the implantation of the Proclaim systems.

157. In fact, the Proclaim system implanted in Plaintiffs had never undergone clinical validation in its final marketed form. The FDA approved the system based on "sufficient similarity" to earlier devices, not on Abbott-sponsored clinical trial data specific to the device actually implanted. Abbott failed to disclose that its device had been significantly altered through nearly 250 PMA supplements, nor that these changes materially affected the device's safety and reliability.

158. The device failed to perform as promised. Plaintiffs experienced loss or lack of therapeutic relief, and several experienced painful shocks or other abnormal stimulation. Plaintiffs Taylor, Cross, and Tracy required surgical revision and removal of their devices, and Plaintiffs Marshall and Johnson have been evaluated for revision or removal. The product was not safe, effective, or reliable as expressly warranted by Abbott, and Abbott failed to provide adequate warnings or updates contradicting its original claims.

159. Abbott's breach of its express warranties directly and proximately caused Plaintiffs' injuries. Had the device performed as warranted, Plaintiffs would

not have suffered worsening pain, adverse neurological symptoms, or, as to Plaintiffs Taylor, Cross, and Tracy, required surgical intervention.

160. As a result of this breach of express warranty, Plaintiffs are entitled to recover all compensatory damages allowed under applicable law, including medical expenses, pain and suffering, and other economic and noneconomic losses.

## COUNT V: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE

(Under Applicable State Law)

161. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

162. Under Illinois law, a seller who is a merchant with respect to goods of that kind warrants that the goods shall be merchantable and fit for the ordinary purposes for which such goods are used. California, Arkansas, Florida, Georgia, and Texas law are in accord.

163. Abbott Laboratories is a merchant engaged in the business of manufacturing, marketing, and selling spinal cord stimulator systems, including systems implanted in Plaintiffs. These devices are used for the ordinary purpose of treating chronic pain through safe and effective neuromodulation therapy. Plaintiffs did not discover, and could not have reasonably discovered, the breach of Abbott's implied warranties until the dates alleged in Section VI above; Abbott's fraudulent concealment of the device's true safety and efficacy tolled and continues to toll the running of any applicable limitations period as to Plaintiffs' claims. Abbott continues to deny that there are any problems with the relevant devices.

164. When Abbott marketed and sold its SCS systems implanted in Plaintiffs, it impliedly warranted that the devices were of merchantable quality, conformed to FDA-approved specifications, and were reasonably safe for its intended medical purpose. Abbott also impliedly warranted that the devices were

fit for the specific purpose of long-term implantation to treat Plaintiffs' condition, as recommended by their physician(s).

165. The devices implanted in Plaintiffs were not of merchantable quality, nor were they fit for their intended purpose. They failed to operate as expected due to known defects in firmware execution, wireless programming, lead integrity, lead and IPG fixation, and therapy delivery. Plaintiffs experienced therapy failure; several experienced painful shocks; and Plaintiffs Taylor, Cross, and Tracy underwent surgical revision and removal due to the product's unreliability and malfunction.

166. These failures were not caused by misuse or physician error. They were the direct result of design-altering changes Abbott implemented without corresponding clinical testing or validation, and without disclosing these risks in labeling or provider materials. The devices failed to conform to the minimum standards of merchantability and fitness for long-term neuromodulation therapy.

167. Abbott's breach of implied warranties was a proximate cause of Plaintiffs' injuries, including physical pain, surgical intervention, economic loss, and emotional distress. Plaintiffs would not have consented to the implantation had they or their physician(s) known the device was unfit for its intended use.

## COUNT VI: NEGLIGENCE

(Under Applicable State Law)

168. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

169. Abbott Laboratories owed Plaintiffs a duty of reasonable care in the design, development, manufacture, labeling, testing, marketing, sale, and post-market surveillance of the spinal cord stimulator systems that it placed into the stream of commerce.

170. Abbott breached its duty of care in one or more of the following ways:

a. By negligently failing to ensure that the devices were manufactured in accordance with FDA-approved specifications, including labeling, firmware, battery safety, lead integrity, and programming reliability standards;

b. By negligently introducing cumulative design changes through successive PMA supplements without proper validation, public clinical testing, or physician disclosure;

c. By negligently failing to investigate known risks associated with stimulation loss, painful shocks, and therapy failure, despite premarket complaints, post-market adverse event reports, and internal device testing;

d. By negligently failing to update its IFU, provider communications, or promotional materials in accordance with 21 C.F.R. § 814.39(d) and 21 C.F.R. § 820.198, despite known malfunctions;

e. By negligently failing to report adverse events related to its Proclaim SCS systems in accordance with 21 C.F.R. Part 803;

f. By failing to initiate corrective and preventive actions under 21 C.F.R. § 820.100 after receiving adverse reports of stimulation instability, lead migration, or battery failure consistent with the experience of Plaintiffs and other patients.

171. These negligent acts and omissions constitute breaches of Abbott's duty of reasonable care under state common law -- a duty that exists independent of, and is not created by, the FDCA. See Restatement (Third) of Torts: Products Liability § 2 cmt. a. The federal regulatory violations identified above, including 21 C.F.R. Part 803, 21 C.F.R. §§ 820.30(g), 820.75, 820.100, 820.198, and 814.39(a)-(d), are pled as evidence of the standard of care applicable to that independently existing duty, not as the source of the duty itself, and are not preempted under *Riegel v. Medtronic* or *Buckman v. Plaintiffs' Legal Committee*. Abbott's deviation from

these standards was not isolated, but systemic, as evidenced by repeated internal and public reporting of identical failure modes across multiple product models.

172. Illinois law similarly imposes a duty on manufacturers to exercise ordinary care in the design, manufacture, labeling, and distribution of medical devices, including duties to investigate known hazards and warn of risks not adequately disclosed. California, Arkansas, Florida, Georgia, and Texas law are in accord.

173. Abbott's breach of its duties of care caused Plaintiffs' injuries. As alleged above, Plaintiffs suffered device malfunction and therapy failure, which for Plaintiffs Taylor, Cross, and Tracy resulted in surgical revision and removal of the SCS system. These harms were foreseeable and preventable had Abbott exercised reasonable care.

174. As a direct and proximate result of Abbott's negligence, Plaintiffs suffered physical pain, emotional distress, financial harm, and other compensable damages under California, Arkansas, Florida, Georgia, Texas, and Illinois law.

## COUNT VII: NEGLIGENT MISREPRESENTATION

(Under Applicable State Law)

175. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

176. At all times relevant, Abbott Laboratories, in the course of its business, made representations to healthcare providers, patients, and the general public regarding the safety, effectiveness, regulatory status, and performance of its spinal cord stimulator systems.

177. Abbott represented, through promotional materials, IFU, patient education resources, and provider training, that its SCS devices: were safe and effective for the long-term treatment of chronic pain; were fully FDA-approved and compliant with all applicable regulations; had been validated through rigorous

clinical trials or otherwise demonstrated safe through FDA-approved testing; and maintained reliability in therapy delivery, stimulation programming, and battery recharging.

178. These representations were false. As set forth in the preceding allegations, Abbott failed to disclose that: the Proclaim devices had never been clinically validated in their marketed form; these devices had undergone significant design and firmware changes through more than 230 PMA supplements; these changes materially altered its performance and introduced new, untested risks; and multiple recalls and adverse events had already emerged related to therapy shutoff, stimulation spikes, battery failure, and wireless programming.

179. Abbott made these misrepresentations and omissions in a commercial context, intending physicians and patients to rely on them in making decisions regarding device selection, implantation, and long-term management.

180. Abbott made misrepresentations directly to Plaintiff Patania through its sales representative, as alleged above, and its representatives reinforced Abbott's misrepresentations and omissions to Plaintiffs Patania, Cross, Tracy, and Marshall when responding to their device complaints. Upon information and belief, Abbott's representatives likewise communicated with the remaining Plaintiffs and their physicians regarding the devices' expected performance and programming.

181. Plaintiffs' treating physician reasonably relied on Abbott's misrepresentations when selecting the Abbott system for implantation. Plaintiffs, in turn, relied on the statements made by Abbott in patient-directed materials and, as to Plaintiff Patania and, upon information and belief, the remaining Plaintiffs, directly by Abbott's sales representatives, including assurance of FDA approval, therapy safety, and reliability, when consenting to implantation. Plaintiff Patania relied on the representative's statement that the device was "85% positive" in relieving pain in electing permanent implantation.

182. Abbott failed to exercise reasonable care in obtaining or communicating accurate information about the device's clinical validation, safety risks, and actual approval history. A reasonable manufacturer in Abbott's position would have known, or should have known, that its cumulative modifications had introduced serious safety issues and altered the nature of the devices from its predicate.

183. As a direct and proximate result of Abbott's negligent misrepresentations and omissions, Plaintiffs suffered foreseeable physical and economic harm, including the pain and cost of unnecessary and dangerous implantation, revision surgery, and/or removal for certain Plaintiffs.

184. For avoidance of doubt, Plaintiffs allege misrepresentations were made to them and their healthcare providers, not the FDA.

## COUNT VIII: FRAUDULENT CONCEALMENT

(Under Applicable State Law)

185. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

186. At all times relevant, Abbott Laboratories had superior knowledge of critical facts concerning the safety, efficacy, and approval history of its spinal cord stimulator systems—information not available to Plaintiffs, their treating physician(s), or the general public.

187. Abbott was under a duty to disclose material facts relating to the performance and risks of the Proclaim systems due to: exclusive access to adverse event reports and internal product complaint data; control over PMA supplement disclosures and labeling updates; direct and indirect representations to patients and physicians; statutory and regulatory duties under 21 C.F.R. §§ 803.50, 814.39, and 820.198 to disclose newly acquired safety information.

188. Abbott actively concealed or failed to disclose that: the SCS systems

had undergone extensive, untested design and firmware changes; the FDA had approved the devices based only on similarity to legacy SCS systems, not on new clinical trial data; known issues with therapy interruption, painful shocks, high lead impedance and lead short circuits, lead migration, and unintended stimulation had been internally reported but not publicly disclosed; and these issues resulted in multiple FDA recalls, including Class I recalls of Proclaim IPGs in 2023 and Class II recalls in 2024, which mirror the adverse experiences of Plaintiffs and other patients.

189. Abbott's concealment was carried out through specific statements and conduct of its representatives, which gave rise to a duty to disclose the full truth: (a) after telling Plaintiff Patania that the device was "85% positive" in relieving pain, Abbott's representative Britney responded to each of his complaints of continuing pain only by reprogramming the device, approximately four to five times, without disclosing known failure modes; (b) Abbott's representative responded to Plaintiff Cross's continuing arm pain and myelopathy symptoms by changing his stimulator settings, without disclosing known failure modes; and (c) Abbott's representatives reprogrammed Plaintiff Tracy's device after her September 2023 revision and met with her in November 2023, when she reported shocking and generator-site pain, without disclosing known failure modes..

190. Abbott's concealment of these material facts was intentional, or made with reckless disregard for the truth, and was undertaken to encourage widespread implantation and minimize safety concerns in order to preserve market share.

191. Plaintiffs and their physician justifiably relied on Abbott's omission of material safety information when consenting to implantation of the SCS systems. Plaintiffs were unaware—and had no way of knowing—that Abbott was concealing data and risks that materially affected the safety of these devices.

192. Abbott's fraudulent concealment directly and proximately caused the

Plaintiffs' injuries, including their exposure to harmful device malfunctions, surgical intervention for certain Plaintiffs, and resulting physical and emotional harm. Had the concealed risks been disclosed, Plaintiffs would not have consented to implantation. The concealment of safety-related defects amounted to active fraud in the context of patient trust and medical device implantation. For the avoidance of doubt, Plaintiffs are not alleging fraud on the FDA.

**COUNT IX: VIOLATION OF CONSUMER PROTECTION LAWS**

(Under Applicable State Law)

193. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

194. Abbott Laboratories, through its consumer-oriented marketing, labeling, promotional efforts, and public communications, engaged in false, misleading, and deceptive acts and practices in connection with the promotion and sale of its spinal cord stimulator systems that were implanted in Plaintiffs.

195. These acts include: falsely advertising the devices as safe, effective, and FDA-approved without disclosing that the approved form of the device was materially altered through over 230 PMA supplements; failing to disclose known malfunctions, including painful shocks, device shutdowns, and therapy loss; omitting material information regarding recalls, firmware instability, and clinical trial limitations; and misrepresenting the scope and meaning of FDA approval to patients and providers.

196. Plaintiffs were foreseeable consumers of the device. Although they relied in part on their physician's advice, Abbott engaged in direct-to-consumer advertising and disseminated patient-facing marketing materials that contained false or misleading information.

197. Plaintiffs and their physician(s) reasonably relied on Abbott's omissions and misrepresentations when consenting to device implantation. Had the

material facts been disclosed, Plaintiffs would not have proceeded with implantation.

198. As a result of Abbott's statutory violations, Plaintiffs suffered personal injury and economic loss and are entitled to recover all damages, equitable relief, and attorneys' fees available under state consumer protection laws.

**COUNT X: NEGLIGENCE PER SE – UNAUTHORIZED PRACTICE OF MEDICINE**

(Under Applicable State Law)

199. Plaintiffs incorporate by reference all allegations set forth above as though fully set forth herein.

200. California, Arkansas, Florida, Georgia, Illinois, and Texas law prohibits the unauthorized practice of medicine by any individual or corporate entity not licensed in California, Arkansas, Florida, Georgia, Illinois, or Texas, respectively. These prohibitions reflect a clear public policy interest in ensuring that only licensed professionals make medical decisions affecting patient care.

201. Abbott Laboratories is not licensed to practice medicine in California, Arkansas, Florida, Georgia, Illinois, Texas, or any other state. Nevertheless, Abbott exercised functional control over the administration of Plaintiffs' neuromodulation therapy by: actively participating in the implantation of Plaintiff Marshall's SCS system and intraoperatively programming that system; programming and reprogramming the SCS systems of Plaintiffs Patania, Cross, Tracy, and Marshall after implantation; and, upon information and belief, consistent with Abbott's practice of having its representatives attend implant procedures and program its devices, similarly participating in the implantation and programming of the remaining Plaintiffs' SCS systems; pushing firmware updates and stimulation programming changes remotely after implantation; designing and controlling preset therapy "profiles" that physicians could not override without manufacturer

approval; and altering battery behavior, stimulation amplitude, and system responsiveness without physician direction or real-time medical oversight.

202. These actions constitute the unauthorized practice of medicine, as they involved making decisions about the nature, extent, and delivery of Plaintiffs' therapy during and after implantation, without informed consent or involvement by a licensed provider.

203. Under California, Arkansas, Florida, Georgia, Illinois, and Texas law, violation of a safety statute gives rise to negligence per se where the injured party is within the class the statute was intended to protect and the injury is of the type the statute was designed to prevent.

204. Plaintiffs, as patients undergoing neuromodulation therapy, are squarely within the protected class. Their injuries, caused by improper therapeutic manipulation without medical oversight, are the exact type the law is intended to prevent.

205. In the alternative, Illinois law also prohibits the unlicensed practice of medicine. *See* 225 ILCS 60/3, 60/49. Abbott's corporate conduct originating from its Illinois headquarters violated that statute by enabling automated therapy changes and device behavior modulation outside the physician-patient relationship.

206. As a direct and proximate result of Abbott's unauthorized and unlicensed manipulation of Plaintiffs' therapy, Plaintiffs suffered harm, including painful stimulation, surgical revision for certain Plaintiffs, and other physical and emotional injuries. This harm was exacerbated by Plaintiffs' loss of therapeutic control, wherein Abbott, through remote firmware updates, preset programming, and device-level automation, functionally practiced medicine by dictating post-implant treatment decisions that should have remained within the licensed provider-patient relationship.

## PRAYER FOR RELIEF

207. **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant Abbott Laboratories as to all counts, and award the following relief:

a. Compensatory damages in an amount to be determined at trial for physical injury, pain and suffering, emotional distress, medical expenses, loss of enjoyment of life, and all other actual damages recoverable under applicable law;

b. Statutory damages and attorney's fees and costs pursuant to any applicable consumer protection statutes;

c. Punitive or exemplary damages, as allowed by law, based on Defendant Abbott's willful, malicious, and/or reckless disregard for the safety and rights of Plaintiffs and the public;

d. Award attorneys' fees and costs associated with this action under applicable law;

e. Pre-judgment and post-judgment interest as provided by law;

f. The costs of this action; and

g. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 9, 2026

Respectfully submitted,

**WISNER BAUM, LLP**

*/s/ Behram V. Parekh*

Behram V. Parekh (180361)
bparekh@wisnerbaum.com
11111 Santa Monica Blvd., Ste. 1750
Los Angeles, CA 90025

Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Counsel for Plaintiffs*